**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:05cv333**

| | | |
|---|---|---|
| **MECKLENBURG COUNTY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF DECISION** |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | **AND ORDER** |
| | ) | |
| **TIME WARNER** | ) | |
| **ENTERTAINMENT-ADVANCE/** | ) | |
| **NEWHOUSE PARTNERSHIP,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Partial Summary Judgment Fed. R. Civ. P. 56 [Doc. 18], and the

Defendant's Motion for Summary Judgment Fed. R. Civ. P. 56 [Doc. 30].

For the reasons that follow, the Court determines that the Defendant is

entitled to judgment as a matter of law.

## I. SUBJECT MATTER JURISDICTION

Before addressing any substantive issues in this case, the Court

must address whether subject matter jurisdiction lies in this Court.  District

courts have an independent obligation to address subject matter jurisdiction, an obligation which may be exercised *sua sponte*. <u>Ellenburg v. Spartan Motors Chassis, Inc.</u>, 519 F.3d 192, 196 (4th Cir. 2008). The jurisdictional allegations set out in the Complaint and the Answer were insufficient to demonstrate that jurisdiction was proper in this Court. The Court, therefore, required the parties to respond concerning the citizenship and principal places of business of the various entities involved in the ownership of the Defendant as of the date the Complaint was filed, June 22, 2005, and the date the action was removed to this Court, July 21, 2005. [Doc. 50]. The parties have responded, and the Court is now able to address this issue.

This case was originally filed in North Carolina Superior Court and removed to this Court by the Defendant, alleging diversity jurisdiction. 28 U.S.C. §1332. In order to remove a case based on diversity of citizenship, such diversity must exist at the time of the filing of the original complaint in state court and at the time of removal. <u>Grupo Dataflux v. Atlas Global Group, L.P.</u>, 541 U.S. 567, 571, 124 S.Ct. 1920, 1924, 158 L.Ed.2d 866 (2004); <u>Ryan ex rel. Ryan v. Schneider Nat'l Carriers, Inc.</u>, 263 F.3d 816, 819 (8th Cir. 2001); <u>United Food & Commercial Workers Union, Local 919 v. Centermark Properties</u>, 30 F.3d 298, 301 (2d Cir. 1994).

For the purposes of ascertaining whether diversity exists, the "citizenship" of the parties must be determined.   Since the State is not a "citizen" for the purposes of diversity jurisdiction, <u>Postal Telegraph Cable Co. v. Alabama</u>, 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed 231 (1894); <u>Minnesota v. Northern Securities Co.</u>, 194 U.S. 48, 63, 24 S.Ct. 598, 601, 48 L.Ed. 870 (1904), the question arises as to whether Plaintiff Mecklenburg County, as a political subdivision of the State of North Carolina, is a "citizen."  The Supreme Court has answered this question in the affirmative, stating that "for purposes of diversity of citizenship, political subdivisions are citizens of their respective States." <u>Moor v. County of Alameda</u>, 411 U.S. 693, 718, 93 S.Ct 1785, 1800, 36 L.Ed.2d 596 (1973) (quoting <u>Illinois v. City of Milwaukee</u>, 406 U.S. 91, 97, 92 S.Ct.1385, 1390, 31 L.Ed.2d 712 (1972)).

Ascertaining the citizenship of Defendant Time Warner Entertainment - Advance/Newhouse Partnership (Time Warner), however, is not so simple a proposition.  Even though the Defendant is a single entity, its ownership structure was so complex and byzantine at the time of removal as to be dizzying.  For diversity purposes, a partnership is a citizen of all states in which its constituent partners are citizens.  <u>Carden v. Arkoma Associates</u>, 494 U.S. 185, 195, 110 S.Ct. 1015, 1021, 108 L.Ed.2d 157

(1990). Likewise, a limited liability company is a citizen of all states in which its constituent members are citizens.[1] Id.; Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 121 (4th Cir. 2004). The ownership structure of Time Warner as of the relevant dates was quite complex, thus necessitating a careful analysis to determine whether removal was proper as the basis of diversity jurisdiction.[2]

On the dates in question, Time Warner was a New York general partnership with its principal place of business in Connecticut. [Doc. 53-2 at ¶5]. Time Warner did not have any limited partners, [Id., at ¶6], but had three general partners:

---

[1] This, however, is not the law when applying the minimal diversity provisions under CAFA, where a limited liability company is a citizen only of the state of its organization and the state of its principal place of business. 28 U.S.C. §1332(d)(10). Ferrell v. Express Check Advance of SC, LLC, (4th Cir. 09-2401, decided Jan. 8, 2010).

[2] The Court is aware of the ruling in County of Durham v. Time Warner, 2008 U.S. Dist. LEXIS 70759 (Sept. 16, 2008), recommendation accepted 1:08cv225, Doc. 49 (M.D.N.C., Nov.6, 2008), in which the District Court in the Middle District of North Carolina held that diversity did not lie in an action between a North Carolina County and the Defendant herein because Time Warner is a North Carolina citizen for diversity purposes. The dates of filing and removal in that case were, however, subsequent to the filing and removal of the present matter. The facts upon which the Court relied in County of Durham to find Time Warner's North Carolina presence for diversity purposes are absent in this case, having resulted from the transfer of certain ownership interests in the constituent entities of the Defendant after the removal of the present case. "The general rule in diversity cases is that if the jurisdictional requisites are present when the action begins, subsequent events will not ordinarily defeat the district court's jurisdiction." Hill v. Rolleri, 615 F.2d 886, 889 (9th Cir. 1980) (citing St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 295, 58 S.Ct. 586, 593, 82 L.Ed. 845 (1938); Hardenbergh v. Ray, 151 U.S. 112, 118, 14 S.Ct. 305, 306, 38 L.Ed. 93 (1894); and Mollen v. Torrence, 22 U.S. 537, 538, 6 L.Ed. 154 (1824)).

(1) Time Warner Entertainment Company (TWE), a Delaware limited partnership with its principal place of business in Connecticut;

(2) Time Warner NY Cable LLC (NY Cable), a Delaware limited liability company with its principal place of business in Connecticut; and

(3) Advance/Newhouse Partnership (ANP), a New York general partnership with its principal place of business in New York. [Id.].

Since all of these constituent partners are themselves either partnerships or limited liability companies, the Court must look through to their respective partners and members to determine the citizenship of Time Warner.

TWE, one of Time Warner's three general partners, had five constituent partners: three general partners and two limited partners. The general partners were:

(1) Time Warner NY Cable LLC (NY Cable), (which is also a constituent partner in Time Warner), and as stated above is a Delaware limited liability company with its principal place of business in Connecticut;

(2) Time Warner Entertainment Holding I LLC (TWE Holding I), a Delaware limited liability company with its principal place of business in Connecticut; and

(3) Time Warner Entertainment Holding II LLC (TWE Holding II), a Delaware limited liability company with its principal place of business in Connecticut. [Id., at ¶7].

Its limited partners were:

> (1) TWE Holding I Trust (Holding I Trust), a Delaware statutory trust with its principal place of business in Delaware; and

> (2) American Television and Communications Corporation (ATCC), a Delaware corporation with its principal place of business in New York. [Id.].

Once again, three of the five partners in TWE were limited liability companies, and therefore the Court must look through to yet another layer of their respective constituent partners and members to determine the citizenship of TWE and thus the citizenship of Time Warner. In the same manner, a determination must be made as to the citizenship of the trust and the corporation that are the limited partners in TWE, because if either of them is found to be a citizen of North Carolina, diversity does not exist and jurisdiction does not lie. The fact that they were limited partners is irrelevant. Their citizenship nonetheless dictates the citizenship of TWE, which in turn dictates the citizenship of Time Warner. See Carden, 494 U.S. at 195-96, 110 S.Ct. at 1021.

Three of the entities identified above are limited liability companies consisting of only one member. The only member of NY Cable, TWE Holding I and TWE Holding II was Time Warner Cable, Inc. (TWC), a Delaware corporation with its principal place of business in Connecticut.

[Id., at ¶8].  A corporation is a citizen of the state of its incorporation and of the state where it maintains its principal place of business.  28 U.S.C. §1332(c)(1).  Hence NY Cable, TWE Holding I, TWE Holding II and TWC are citizens of Delaware and Connecticut, and ATCC (the limited partner) is a citizen of Delaware and New York.

The third constituent partner in Time Warner was Advance/Newhouse Partnership.  At the relevant time it was a general partnership with no limited partners. [Doc. 53-2 at ¶11].  It had two general partners:

> (1) Advance Cable Holdings Corporation, a New York Corporation with its principal place of business in New York; and

> (2) Newhouse Cable Holdings, LLC, a New York limited liability company with its principal place of business in New York. [Id.].

The only member of Newhouse Cable Holdings, LLC was Newhouse Broadcasting Corporation, a New York corporation with its principal place of business in New York. [Id.].  Hence Advance/Newhouse Partnership is a citizen only of the State of New York.

Since none of these constituent entities (with the exception of the trust) are citizens for diversity purposes of the State of North Carolina, diversity jurisdiction will lie in this Court unless the constituent trust, TWE

Holding I Trust , is a citizen of North Carolina.

The citizenship of a trust for diversity purposes does not appear to be a settled issue.  The Defendant argues that one should look only to the citizenship of the beneficiaries of the trust to determine its "citizenship," much like one would look to the partners of a partnership.[3] [Doc. 53].  The Court, however, is unpersuaded by the Defendant's argument.

In <u>Carden</u>, the Supreme Court clearly indicated (allbeit in dictum) that the citizenship of a trust for diversity purposes is dictated by the citizenship of its "members" rather than any situs of the trust as an entity unto itself. 494 U.S. at 195-96, 110 S.Ct. at 1021.  The Defendant does not dispute this, but argues that only the beneficiaries are the "members" of a trust. Defendant relies on <u>Riley v. Merrill Lynch</u>, 292 F.3d 1334 (11th Cir. 2002), to support this proposition, but this reliance is misplaced.  In <u>Riley</u>, the citizenship of the trustees, as well as the beneficiaries, was analyzed in order to determine that diversity did not lie.  In <u>Carden</u>, the Supreme Court stated "We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all the members, *the several persons composing such association*." 494 U.S. at 195-96, 110

---

[3] The Plaintiff did not present any argument on this point in its Response [Doc. 54].

S.Ct. at 1021 (citing <u>Chapman v. Barney</u>, 129 U.S. 677, 682, 9 S.Ct. 426, 427, 32 L.Ed. 800 (1889); <u>Great Southern Fire Proof Hotel Co. v. Jones</u>, 177 U.S. 449, 456, 2 S.Ct. 690, 693, 44 L.Ed. 842 (1900) and <u>Steelworkers v. R.H. Bouligny, Inc.</u>, 382 U.S. 145,146, 86 S.Ct. 272, 273, 15 L.Ed.2d 217 (1965)) (internal quotes and citations omitted, emphasis added).  With regard to a business trust, it is a complete distortion of reality to argue that the beneficiaries alone constitute "the several persons composing such association."  Without the trustees, the association - and the trust as a separate business entity - would not exist.  For this reason, the Court must conclude as a matter of law that the citizenship of the trustees as well as the beneficiaries must be diverse in order for jurisdiction to lie in this Court.  <u>See also</u> <u>Emerald Investors Trust v. Gaunt Parsippany Partners</u>, 492 F.3d 192 (3d Cir. 2007); <u>Hickling Engineering, L.C. v. Bartell</u>, 439 F.3d 346 (7th Cir. 2006).

An entity named MOC Holdco I, LLC, was the sole beneficiary of the trust at the relevant time.  It was a Delaware limited liability company with its principal place of business in Pennsylvania. [Doc. 53-2 at ¶9].  The sole member of MOC Holdco I, LLC, was Comcast of Georgia, Inc., a Colorado corporation with its principal place of business in Pennsylvania. [<u>Id</u>.].

TWE Holding I Trust had two trustees:  (1) The Capital Trust

Company of Delaware, a Delaware corporation with a principal place of business in Delaware (referred to in the Tohvert Affidavit as "the Delaware Trustee") and (2) the Operating Trustee, Edith E. Holiday (Holiday), an individual. [Id.]. Once again, all of the non-human entities are citizens of states other than North Carolina. Hence, diversity is present unless the individual trustee, Holiday, is a citizen of the State of North Carolina.

As for Holiday, Time Warner has filed her affidavit in which she testified to the following facts: (1) she was the Operating Trustee of the TWE Holding I Trust at the time in question; (2) in that position, she was responsible for managing the assets of the Trust; (3) during the time that she served as the Operating Trustee, Holiday maintained an office in Delaware for the purpose of conducting the business of the Trust, as was required by the Trust; (4) at the time in question, she owned a home in the District of Columbia, where she had resided since 1989; (5) she maintained a home office in the District of Columbia; (6) Holiday spent the majority of her time in the District of Columbia unless she was required to travel due to business; (7) Holiday was a member of the Metropolitan Club in the District of Columbia; (8) she and her family had memberships in the Chevy Chase Club in Maryland and the St. Albans Tennis Club in the District of Columbia; (9) she attended church at the National Cathedral in

the District of Columbia; (10) Holiday's minor daughters attended school in the District of Columbia; (11) Holiday paid District of Columbia income taxes; (12) Holiday had her principal checking accounts in the District of Columbia; (13) Holiday had a District of Columbia driver's license and (14) she owned two automobiles which were registered in the District of Columbia. [Doc. 53-3 at 1-3].

At the time in question, Holiday also owned a vacation home in Highlands, North Carolina. [Id.]. Holiday and her husband purchased the home with her parents in 1985. [Id.]. When Holiday's father died in 1999, she and her husband purchased her parent's ownership in that home. [Id.]. Holiday maintained a bank account in North Carolina containing a *de minimis* amount for household expenses. [Id.]. She had one automobile registered in the State of North Carolina and had a family membership at the Highlands Country Club. [Id.]. Holiday was registered to vote in North Carolina. [Id.]. Holiday did not work in North Carolina, earn income in North Carolina or pay income taxes in North Carolina. [Id.].

"[S]tate citizenship for purposes of diversity jurisdiction depends not on residence, but on national citizenship and domicile." Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc., 145 F.3d 660, 663 (4th Cir. 1998), (citing Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 828, 109 S.Ct.

2218, 104 L.Ed.2d 893 (1989)).  In determining citizenship and domicile, a court may consider such factors as the place in which the individual actually resides, does business, pays taxes, receives mail, has a driver's license registered, has an automobile registered, has title to and ownership of real and personal property, has a telephone listing, pays for utilities, conducts banking, carries on a social life and exercises political rights. Krasnov v. Dinan, 465 F.2d 1298, 1301 (3rd Cir. 1972).  In addition to these factors, a court should consider where the individual intended to reside at the time the suit was filed.  Reaves v. Contracting Enterprising, Inc., No. Civ. A. 7:06cv00637, 2007 WL 218718 at *2 (W.D.Va. 2007) (citing Webb v. Nolan, 484 F.2d 1049 (4th Cir. 1973), cert. denied, 415 U.S. 903, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974)).

In this case, Holiday has stated in her affidavit that she has lived in the District of Columbia, where she has owned a home, since 1989.  Her children go to school there.  See Coury v. Prot, 85 F.3d 244, 251 (5th Cir. 1996) (domicile shown by place individual maintains home for her family); Commercial Bank & Trust Co. v. Kattar, 307 F.Supp. 456 (D.Mass. 1969) (defendant, whose five children attended private school in Massachusetts where she resided during the school year, was Massachusetts citizen despite summer home in New Hampshire).  Her religious life is spent there

and her social life is spent primarily there.  See McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286 (3rd Cir. 2006) (membership in organizations factor to be considered).  Holiday works at home in the District of Columbia, except when she has to travel to Delaware to be in the Trust's office there.  She does not work in North Carolina.  The only income taxes she pays are in the District of Columbia.  See Coury, 85 F.3d at 251;  Liakakos v. CIGNA Corp., 704 F.Supp. 583, 587 (E.D. Pa. 1988). Holiday primarily banks in the District of Columbia where she has two automobiles registered as well as her driver's license registration. See McCann, 458 F.3d at 286.  There is no indication that Holiday intends to reside full time in any location except the District of Columbia. See Reaves, 2007 WL 218718 at *2; Goode v. STS Loan & Management, Inc., No. Civ. A. DKC 2004-0999, 2005 WL 106492 at *6 (D. Md. 2005), (quoting Dyer v. Robinson, 853 F.Supp. 169, 172 (D. Md. 1994) ("Although there is no statutory definition of an individual's state of citizenship, courts have held that it is the state of the individual's domicile; *i.e.*, the state he considers his permanent home.")).

The fact that Holiday and her husband own a vacation home in North Carolina is not dispositive. See Goode, 2005 WL 106492 at *6.  The home was originally purchased with Holiday's parents, showing that Holiday at no

time considered it her primary or permanent home.  <u>See</u> <u>Madison v.</u> <u>Universal Marketing Innovators, Inc.</u>, No. Civ. A. 00-3924, 2004 WL 1737486 at *5 (E.D. Pa. 2004) (party who had vacation house in Maryland where he spent most weekends during the summer, determined to be Pennsylvania citizen, not a Maryland citizen).  "The essential elements of domicile are '[r]esidence in fact, coupled with the purpose to make the place of residence one's home.'" <u>Goode</u>,  2005 WL 106492 at *6 (citation omitted).  There is no evidence here that Holiday, at the time in question, had any intent to make any place other than the District of Columbia her home.

The only troubling aspect of the evidence regarding Holiday's actions pertain to her voter registration in the State of North Carolina.  In order to have registered to vote, it was incumbent upon Holiday to demonstrate to North Carolina election officials that she was a *resident* of the State.  <u>See</u> N.C. Gen. Stat. §163-55(a).  For voter registration purposes the statute states "That place shall be considered the residence of a person in which that person's habitation is fixed, and to which, whenever that person is absent, that person has the intention of returning." N.C. Gen. Stat. §163-57(1).  The statute contains an exception for persons living in the District of Columbia, as Holiday asserts she does, that reads as follows: "If a person

removed to the District of Columbia or other federal territory to engage in the government service, that person shall not be considered to have lost residence in this State during the period of such service . . ." N.C. Gen. Stat. §163-57(8). This exception, however, is inapplicable to Holiday's situation because she states in her affidavit that she is in private business and not in government service. Moreover, there is no evidence that Holiday removed from the State of North Carolina to the District of Columbia, but rather lived outside of this State and then purchased a vacation home here. This presents the Court with the apparent contradiction between the testimony of Holiday in her affidavit and the representations she apparently made in her voter registration.

Notwithstanding that her voter registration may have been contrary to law, the evidence is overwhelming that Holiday's domicile is, in fact, in the District of Columbia and not in North Carolina. For these reasons, the Court will find as fact that Holiday is a citizen and resident of the District of Columbia for the purposes of determining whether diversity jurisdiction lies in this case. It is also noted that registration to vote in one state while actually residing and working in another state is not, standing alone, dispositive of the issue of domicile. Webb, 484 F.2d at 1049 (plaintiff was registered to vote in California and claimed she intended to return there but

was living in North Carolina at the time the action was begun and was not employed in California; held, no diversity jurisdiction as she was domiciled in North Carolina); Krasnov, 465 F.2d at 1301; (voting by absentee ballot in Connecticut while living in Pennsylvania did not establish Connecticut domicile); Abbott v. United Venture Capital, Inc., 718 F.Supp. 823 (D. Nev. 1988). See also, 13B Charles Alan Wright, *et. al.*, Federal Practice and Procedure: Jurisdiction 2d §3612, at 531 ("No single factor is conclusive.").

Based on the foregoing the Court concludes as a matter of law that for the purposes of determining diversity jurisdiction that the Plaintiff is a citizen of the State of North Carolina and that the Defendant is not a citizen of the State of North Carolina,[4] and thus complete diversity existed between the parties as of the dates of filing and removal, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332.

## II.  PROCEDURAL HISTORY

On June 22, 2005, Mecklenburg County (County) instituted this action against Time Warner Entertainment-Advance/Newhouse Partnership (Time Warner) in state court alleging claims for (I) breach of contract; (II) breach of the implied duty of good faith and fair dealing; (III)

---

[4] The Defendant is a citizen of Delaware, Connecticut, New York, Colorado, Pennsylvania and the District of Columbia for diversity purposes.

specific performance of a contractual obligation to provide channels; (IV) specific performance of a contractual obligation to provide an institutional network; and (V) conversion. [Doc. 1]. Time Warner removed the action to this Court based on diversity jurisdiction and simultaneously filed its Answer and Counterclaims seeking declaratory judgment in its favor. [Id., Doc. 2].

The Pretrial Order and Case Management Plan provided for a discovery and mediation deadline of October 9, 2006, with motions due on November 13, 2006. [Doc. 17]. Time Warner, however, moved for partial summary judgment on February 13, 2006 and for summary judgment on April 14, 2006. [Docs. 18, 30]. On February 5, 2007, Magistrate Judge Keesler stayed discovery and all other deadlines until the resolution of the pending motions. [Doc. 48]. This case was subsequently re-assigned to the undersigned for disposition.

### III. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), *certiorari denied* 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004).

A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), *certiorari denied* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994), *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522, *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to

bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

Id.

Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).


## IV.  SUMMARY OF THE FACTS

The operative facts are not in dispute. The overall factual underpinning of this case is sufficiently complex, however, that a summary of the facts is helpful to an understanding of the issues.

In 1982 Plaintiff Mecklenburg County entered into an agreement with Vision Cable of North Carolina (Vision Cable). By the terms of that agreement Vision Cable was granted the franchise to provide cable television services within the unincorporated portions of Mecklenburg County. Vision Cable was obligated to pay to Mecklenburg County a fee equal to three percent (3%) of Vision Cable's gross revenues from the provision of those cable services, and was also obligated to provide cable

infrastructure for an "Institutional Network" or I-Net.  The I-Net was initially

to include five "downstream channels" - i.e. channels for communication by

the County and other selected parties to selected users - and four

"upstream channels" - i.e. channels for transmission of data and other

information from subscribers to the County and others via the cable

network.  The term of the contract was ten years, with an option for a five-

year renewal.

In 1992 the County adopted an ordinance exercising its option to

renew the agreement, which included *inter alia* a statement by the County

that "Vision Cable has substantially performed its franchise obligations."

[Doc. 18-4 at 31].  In 1995 the Defendant acquired Vision Cable, and

Vision Cable assigned its contract rights and obligations to the Defendant,

with the assent and approval of the County.

The contract expired by its terms on August 17, 1997, but the

Defendant continued to provide cable television services in the same

service area and continued to pay the County the franchise fee as called

for in the contract.  Well after the contract expired the Defendant initiated

the process for formal renewal of the franchise agreement, and after many

extensions the County issued a preliminary denial of renewal on December

13, 2004.  The renewal process continued, however, and was on-going at

the time of the filing of the Complaint herein.

Notwithstanding the continuation of the negotiations, the County filed this action in June 2005, claiming that Vision Cable and the Defendant had breached the agreement by failing to provide the I-Net channels. The County claims that this breach occurred in 1983 when the cable system became operational without the I-Net channels, and that such breach was continuing as of the filing of this action because the I-Net channels were still not present.

In addition to seeking damages for the breach, the County seeks specific performance in the form of an order requiring the Defendant to provide the I-Net channels.

The Defendant has moved for summary judgment asserting that this claim is barred by the statute of limitations and that it has substantially performed all obligations required under the contract.

## V. DETAILED STATEMENT OF THE UNDISPUTED FACTS

On December 14, 1981, the County issued a "Request for Proposal (RFP), Franchise[5] for a Cable Television System or a CATV[6] System"

---

[5] Such a franchise means the initial authorization or the renewal thereof between a cable operator and a governmental entity which defines the rights and responsibilities of each in the construction and operation of a cable system within a specified

(hereinafter the "RFP") for the extension of a cable system in the unincorporated areas of Mecklenburg County. [Doc. 23-2, at 2]. Section 11 of the RFP entitled "Required Services and Facilities" [Id. at 14] required the grantee of the franchise to maintain "a plant having the technical capacity for return, or 'two-way' communications," defined as the transmission of telecommunications signals from the control center to subscriber locations as well as the transmission of telecommunications signals from the subscriber locations throughout the system back to the control center. [Id. at 3-4]. The RFP also required six public access, educational, local health and governmental channels "at no cost to users." [Id. at 14]. The Grantee was required to

> provide basic service and one free outlet to all public schools, public hospitals, or other County-owned buildings that are located within the franchised area. No monthly service fee shall be charged to any such outlet. The Grantee shall also provide service to any new facilities as described above, provided such facilities are within 500 feet of the existing service lines of the Grantee.

[Id. at 15].

---

geographic area. 47 U.S.C. §522(9) & (10).

[6] "CATV" means community antenna television. [Doc. 25 at 4]. "Community antenna television shall mean the business of providing an improved television reception service to the public for compensation by receiving broadcast television and radio signals and transmitting such signals by wire or cables to the subscribers, and including any subscription service." [Id. at 5].

Vision Cable of North Carolina (Vision) was one of three companies to submit a proposal in response to the RFP. [Docs. 23-2 and 30-4 at 43-56]. Defendant Time Warner is the successor to Vision. Vision's proposal, submitted on December 17, 1981, specifically referred to the two-way capacity of its system. [Doc. 30-4 at 4] ("Vision will construct fully interactive two-way plant throughout the County to allow such services as opinion polling, home banking, video shopping, utility meter reading and pay-per-view."). The system designed by Vision had the capability of transporting 62 channels downstream within a passband of 54 to 450 MHz and 4 channels upstream[7] within a passband of 5 to 30 MHz. [Id. at 5-6]. In addition, even though exceeding the requirements of the RFP, Vision proposed an institutional network[8] which was described as follows:

1.     All upstream video transmissions will be made using the 5-30 MHz portion of the return bandwidth.

2.     Five video channels on the subscriber network have been reserved for downstream Institutional Network transmission.

[Id. at 8].

---

[7] The parties do not dispute that the term "downstream" means to the customer and that the term "upstream" means away from the customer.

[8] "[T]he term 'institutional network' means a communication network which is constructed or operated by the cable operator and *which is generally available only to subscribers who are not residential subscribers*." 47 U.S.C. §531(f) (emphasis provided). As such, an institutional network is subscribed to by the non-residential users.

Vision's proposal specifically contained five downstream channels reserved for an institutional network, as part of its "Tier III" service. [Doc. 23-2, at 39-42]. The proposal also contained a section describing the Institutional Network:

> Vision Cable has designed its system with *reserved capacity* of five (5) downstream and four (4) upstream channels which will be *available* for Institutional Network purposes.[9] All County government buildings, public or private schools, police and fire stations, museums, hospitals, libraries, colleges, senior citizen centers, day care centers, and nursing homes located in Vision Cable's Mecklenburg County service area *will be connected* to this Institutional Network *free of charge*. There will be no charge *for the initial institutional wiring of up to ten (10) service drops for non-commercial institutional users*.
> ...
> Vision Cable will also provide microwave interconnection of up to fifteen (15) institutions selected by the County which are located in incorporated communities within Mecklenburg County, such as Charlotte.
>
> The Institutional Network will have the capacity for high and low speed data communications, interactive video and audio transmissions, and closed circuit information delivery. Vision is convinced that the demand for Institutional Network utilization will continue to grow, especially as commercial uses are more fully developed, such as:
>
> > computer data transmission between banks, business and industry

---

[9] Doris Boris testified on behalf of the County that the four upstream channels mentioned in the institutional network section of the proposal included virtually all of the upstream capacity of the system and was intended for use by the residential as well as institutional subscribers. [Doc. 30-4 at 58-61]. In other words, these four channels were used by the entire cable system and not just as part of the Institutional Network, even though they were *available* to the Institutional Network. [Id. at 44]..

electronic funds transfers
facsimile
teleconferencing
electronic mail
computerized inventory control[.]
...
These are but a few of the important uses that can be made of
the Mecklenburg County Institutional Network, which Vision Cable
believes will prove to be a very important public resource.

[Id., at 44-45] (italic emphasis added, underlined emphasis in original).

On May 3, 1982, the Board of County Commissioners voted to award the franchise to Vision. [Doc. 25 at 28-39]. The Ordinance awarding the franchise made the award "subject to" the provisions of the RFP, except as modified by the Ordinance, and "subject to" the provisions of Vision's Proposal, except as modified by the Ordinance. [Id., at 28, § 2(B)]. Section 4 of the Ordinance modified the Proposal's Tier III services to specify that out of the five channels reserved for the Institutional Network, three would be "Reserved for Mecklenburg County." [Id. at 33]

On May 26, 1982, Vision "accept[ed] the franchise upon the terms and conditions stated in the May 3, 1982, ordinance, as well as the terms and conditions of the ordinance providing for franchising of CATV systems dated October 18, 1981, the amendment dated May 17, 1982, and those sections of the request for proposals [RFP] as are incorporated therein." [Doc. 23-3 at 3]. The term of the franchise was ten years with a five-year

renewal period upon notice by Vision, upon a finding by the County that Vision had substantially performed its obligations during the initial ten-year period. [Doc. 25 at 41-42].  On March 8, 1983, the agreement was amended to provide for changes in channel alignment and rate structures. [Id., at 46-49].  The amendment also deleted any reference to reserved channels for an Institutional Network, referring instead to channels "reserved for future use." [Id., at 48].

On August 10, 1992, the Board of County Commissioners voted to allow a five-year renewal of the Vision franchise, "as Vision Cable has substantially performed its franchise obligations[.]" [Doc. 18-4 at 31]. Thereafter Time Warner acquired Vision, and on April 1, 1995, the parties entered into an amendment to the Franchise Agreement consenting to the transfer of the franchise.  This contained an amendment of Section 14(a) providing that Time Warner "will assume, be bound by, perform and comply with, all of the covenants, conditions and agreements as may be required in the original Vision Cable Franchise Agreement, dated May 5, 1982[.] (sic)" [Id. at 33-34].

The parties do not dispute that the five-year renewal period for the 1982 Franchise Agreement expired on August 17, 1997.  [Doc. 18-2, at 12

¶9; Doc. 22, at 6].  In April 2003,[10] Time Warner submitted a formal Request for a Renewal Proposal. [Doc. 23-6 at 2-10].  Under 47 U.S.C. § 546(c)(b) the County was required to respond to this request within four months, but in July 2003, the parties signed a letter agreement extending that statutory period by 90 days.  [Doc. 24 at 5-6].  The purpose of the extension was to allow the parties time to negotiate a renewal of the franchise. [Id.].  The parties acknowledged that

> [b]y signing this letter, Time Warner [] and the County agree not to claim that any rights or obligations of either party, [] have been waived or altered by this extension or this agreement[.] [They] also agree that any discussions, written materials exchanged by the parties, or negotiations conducted during the period between the date of this agreement and the end of the extended period referred to above shall be confidential and shall be inadmissible in any proceeding, action or submission ... in any ... legal proceeding[.][11]

[Id.].  The parties signed letter agreements further extending the response period on October 22, 2003; December 16, 2003; January 28, 2004; April 6, 2004; July 12, 2004; and September 29, 2004. [Doc. 24 at 7-24, Exhibits 28, 29, 30, 31, 32, & 33].

---

[10] The proposal is undated, but refers to events occurring prior to April 1, 2003, in the past tense and refers to events anticipated to take place in May 2003 in the future tense. [Doc. 23-6 at 5].  The County's response to the request refers to the request having been submitted on April 2, 2003. [Doc. 24 at 5].

[11] Thus, to the extent the parties have submitted in connection with these motions any documents or other evidence reflecting the actions of the parties during this period after July 2003, they have been excluded from consideration.

On December 13, 2004, the County formally notified Time Warner that it was preliminarily denying renewal of the franchise. [Doc. 24 at 31]. The reason given was the failure of Time Warner to provide the institutional network "free of charge, and [to provide] the I-Net [with] the capacity for high-speed data communications, interactive video and audio transmissions and closed circuit information delivery." [Id. at 34].

The original franchise agreement required Vision/Time Warner to pay annually to the County "remuneration for the privileges of providing CATV service a sum equal to three percent (3%) of the Company's gross annual receipts[.]" [Doc. 25, at Section 5].  According to Sue Breckenridge, Vice President Public Affairs for Time Warner, from 1995 through 2005, Time Warner paid the County over $3.5 million for those privileges. [Doc. 18-3].  It is undisputed that such fees were appropriately paid prior to that period.

In addition to those fees, the franchise agreement required Vision/Time Warner to pay "partial consideration for the CATV franchise in Mecklenburg County" to the Charlotte-Mecklenburg Public Broadcasting Authority. [Doc. 25, at Section 6].  According to Breckenridge, Time Warner paid over $1.4 million in these fees from 1995 through 2005 [Doc. 18-3], and it is undisputed that such fees were appropriately paid prior to that

period.

## VI.  MOTION FOR SUMMARY JUDGMENT

## A.  Statute of Limitations

Time Warner argues that all Plaintiff's claims are barred by the statute of limitations.  The County argues that the statute of limitations is inapplicable, citing the doctrine of *nullum tempus occurrit regi*; that is "no time runs against the king." Rowan County Bd. Of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 6, 418 S.E.2d 648, 652 (1992).

> If the function at issue is governmental, time limitations do not run against the State or its subdivisions unless the statute expressly *includes* the State.  If the function is proprietary, time limitations do run against the State and its subdivisions unless the statute at issue expressly *excludes* the State.

Id., at 9, 418 S.E.2d at 654 (emphasis in original).  It is undisputed that the County is a political subdivision of the State of North Carolina.  Durham Land Owners Ass'n v. County of Durham, 177 N.C.App. 629, 630 S.E.2d 200 (2006); Shavitz v. City of High Point, 177 N.C.App. 465, 630 S.E.2d 4 (2006); Montgomery County v. Microvote Corp., 320 F.3d 440, 445 (3rd Cir. 2003).  The statute of limitations in North Carolina for breach of contract is three years from the date of accrual.  N.C.G.S. §1-52(1).[12]  The statute

_____

[12] The County's fifth cause of action is in tort for conversion of the I-Net system. The statute of limitations for conversion is also three years.  N.C. Gen. Stat. §1-52(4).

neither includes nor excludes the State of North Carolina.  Therefore, the question of whether *nullum tempus* applies is dependent entirely upon whether the County was pursuing a governmental function in obtaining Vision Cable's commitments regarding the I-Net.  <u>Rowan County</u>, 332 N.C. at 16, 418 S.E.2d at 658.  If the County was pursuing a governmental function, then this action is not barred by the statute of limitations.  If the County was pursuing a proprietary function, then this action is barred by the statute of limitations.

The determination of what constitutes a governmental function as opposed to a proprietary function has bedeviled the courts.  The adoption of N.C. Gen. Stat. §1-30 in 1868 appeared to have abrogated the doctrine of *nullum tempus*.  That statute reads "The limitations prescribed by law apply to civil actions brought in the name of the State, or for its benefit, in the same manner as to actions by or for the benefit of private parties." <u>Id</u>. This has been interpreted, however, to mean that when the state is enforcing rights that are essentially equivalent to those that private parties may have (i.e. rights obtained in the pursuit of a proprietary function) then the statute of limitations runs against the state just as it does against a private party.  On the other hand, when the state is enforcing rights that are unique to it, or otherwise peculiar to the operation of government (i.e. rights

obtained in the pursuit of a governmental function) then the doctrine of *nullum tempus* remains alive, and the statute of limitations does not run against the state.    Rowan County, 332 N.C. at 6-9, 418 S.E.2d at 652-53; Tillery v. Whiteville Lumber Co., 172 N.C. 296, 297, 90 S.E. 196, 197 (1916).

Examples of governmental functions include contracting for the construction of a public school, Rowan County, 332 N.C. at 11, 418 S.E.2d at 655; or for construction of a waste water treatment plant, MCI Constructors, Inc. v. City of Greensboro, 125 Fed. Appx. 471, 479 (4th Cir. 2005); or for the construction of a state art museum,  State *ex rel.* State Art Museum Bldg. Com'n v. Travelers Indem. Co., 111 N.C.App. 330, 335, 432 S.E.2d 419, 420, *review denied* 335 N.C. 181, 438 S.E.2d 208 (1993).  On the other hand, actions of the state that have been found to be proprietary in nature include the state enforcing title to real property,  Tillery v. Whiteville Lumber Co., 172 N.C. at 297, 90 S.E. at 197, and providing health care in a county home or state mental hospital, Guilford County v. Hampton, 224 N.C. 817, 819, 32 S.E.2d 606, 608 (1945); State Hospital v. Fountain, 129 N.C. 90, 92-93, 39 S.E. 734, 735 (1901).

In distinguishing governmental and proprietary functions, courts have focused on the objective intended to be fulfilled by the state's act in

obtaining the promise at issue, and whether that objective is peculiar to government or whether non-public entities also commonly harbor such objective.  This has been expressed as "the conceptual distinction between regulator and purchaser." <u>Building & Constrution Trades Council v. Associated Builders & Contractors of Massachusetts</u>, 507 U.S. 218, 229, 122 L.Ed.2d 565, 577, 113 S.Ct. 1190, 1197 (1993) ("<u>Boston Harbor</u>"); <u>Sprint Spectrum L.P. v. Mills</u>, 283 F.3d 404, 419 (2d Cir. 2002).  Thus, when the state purchases a product or service and obtains a promise so as "to ensure an efficient project . . . would be completed as quickly and effectively as possible at the lowest cost," <u>Boston Harbor</u> 507 U.S. at 232, its actions are proprietary in nature because in such circumstances the state is acting as would any prudent purchaser.  <u>Id</u>.  On the other hand, if the state purchases products but places thereon procurement restrictions that serve to regulate the labor relations of the sellers, such action is governmental in nature because the state's action is "for all practical purposes . . . tantamount to regulation," <u>Wisconsin Dep't of Industry, Labor and Human Relations v. Gould, Inc.</u>, 475 U.S. 282, 289, 89 L.Ed.2d 223, 230,106 S.Ct. 1057, 1062 (1986); <u>Sprint Spectrum</u>, 283 F.3d at 418, and thus is acting as only the state does in enacting regulations and legislation. <u>Id</u>.

The County's purpose in obtaining the I-Net is reflected in the contract documents. The I-Net was ultimately to consist of five "downstream" cable television channels to which the County would have access for the purpose of providing the content therefor, and four "upstream" channels that would allow cable subscribers to communicate with the County and others via their cable television connections. In seeking to obtain access to such "downstream" channels, the County was acting no differently from CNN, ABC, NBC, CBS, Fox, HBO or any other cable network in seeking a means of communicating informational content to cable subscribers. The County's interest in seeking such access is no different from the interest of a private entity that seeks the same access.

The County argues that the I-Net would facilitate its communications with schools, law enforcement and hospitals, all of which further the public good, and thus there is a governmental purpose in obtaining these channels. There is nothing, however, in the contract documents that limits the use of these channels in such manner, or indicates that the purpose of the I-Net is so limited. Moreover, the contract documents reflect that the channels reserved for the downstream I-Net were to be part of the "Tier III" of the system, which was to be made available to all who subscribed to it. This clearly was not limited to schools, law enforcement and hospitals.

Even if the I-Net *could* be limited in its delivery to only some of the cable subscribers this would be irrelevant. The County intended to be and contracted to be a purveyor of cable television content. Just because it could possibly limit the recipients of this content to some subscribers does not make its purpose any more governmental. That only makes its intended use of the downstream I-Net more closely akin to the HBO model than the CNN model (i.e. delivered only to limited recipients rather than the subscribers in general). In acting to become a purveyor of informational content over cable television the County was acting as a purchaser, which is a proprietary function. Thus its civil action to enforce its rights to become such a purveyor of content is subject to the statute of limitations "in the same manner as to actions by or for the benefit of private parties." N.C. Gen. Stat. §1-30.

The County's position with regard to its contract to obtain the four "upstream" channels is no better. The County's ordinance awarding the franchise incorporated Vision Cable's proposal, and Vision Cable's acceptance of the contract likewise incorporated the proposal. [Doc. 25 at 28-39]. That proposal contains the following description of the "upstream" capabilities:

The Institutional Network will have the capacity for high and low

speed data communications, interactive video and audio transmissions, and closed circuit information delivery. Vision is convinced that the demand for Institutional Network utilization will continue to grow, *especially as commercial uses* are more fully developed, such as:

> computer data transmission between *banks, business and
> industry*
> electronic *funds transfers*
> *facsimile*
> *teleconferencing*
> *electronic mail*
> computerized inventory control[.]

[Doc. 30-4 at 44-45](emphasis added).

Obviously, technology has developed tremendously since this proposal was submitted in 1981. We now recognize these to be functions largely served by the internet, but in 1981 the internet and even personal computers were concepts in the minds of few. The proposal is nonetheless clear that the "upstream" channels were being proposed to allow the County to have capabilities that are commercial in nature, such as on-line banking, e-mail and teleconferencing. This is no different from the County contracting for internet services today. Such is not a governmental function. Use of such capabilities is not unique to government nor principally employed by government. Quite the contrary, the function fulfilled by obtaining such capabilities is no different from what is commonly sought, obtained and employed by businesses and other

private entities.  The fact that these capabilities potentially could have been used in the performance of governmental functions is not relevant, just as the fact that the title to real property potentially could have been used for a governmental purposes is not relevant, as defending that title is proprietary in nature.  <u>Tillery</u>, 172 N.C. at 297, 90 S.E. at 197.

The County argues that its actions were governmental in nature because the promise to provide the I-Net was contained in a cable franchise agreement, and such agreements are exclusively the province of governmental units.  <u>See</u> N.C. Gen. Stat. §153A-137.[13]   The decision in <u>Rowan County</u>, however, clearly illustrates that the Court must look not to the general nature of the contract as a whole, but to the specific function the state was exercising in obtaining the promise that is the basis of the claim.  The fact that the contract in question in <u>Rowan County</u> was a construction contract, just as would be entered into by private parties, was irrelevant.  If the Court were to look only to the general nature of the contract as a whole, as the County advocates herein, then the Court in <u>Rowan County</u> would have held the state's action to be proprietary in nature.  The Court, however, looked to the capacity in which the state was

---

[13] This statute was repealed by S.L. 2006-151 after the filing of this action, effective January 1, 2007, and the authority to grant cable franchises was transferred to the Secretary of State.  N.C. Gen. Stat. §66-350 et seq.

acting when it obtained the promise it claimed was breached. The state had entered into the contract in order to build a *school*, and it was *that construction* which was allegedly defective. As a matter of law education is a governmental function.[14] Thus, the Court concluded that the state was exercising a governmental function when it obtained the promise for the construction of a safe and adequate school building.[15] Id. at 16, 418 S.E.2d at 658. By contrast, the obligation the County seeks to enforce in the instant case was ancillary to any governmental purpose inherent in the granting of the cable franchise agreement.

Since the rights that the County seeks to vindicate by this suit were obtained in the exercise of a proprietary function, the doctrine of *nullum tempus* does not operate to prevent the running of the statute of limitations. The parties do not dispute that the statute of limitations that would apply (if

---

[14] The Court in Rowan County went to substantial lengths to demonstrate that education is, in fact, a governmental function, despite the fact that private entities provide education in addition to the public school system. At bottom, the Court found that Article IX, Section 2 of the North Carolina Constitution made education a governmental function.

[15] As a second basis for its holding the Court reasoned that state had expended public funds to remediate a potential health risk in the form of friable asbestos that had been found in a public school. The action was to recover government funds expended for protecting public health in a public building and doing so was governmental in nature. Rowan County, 332 N.C. at 16, 418 S.E.2d at 658. This, of course, is inapplicable to the present case, because the County herein did not expend public funds for anything related to its attempt to obtain the INET, and the INET was not sought for a purpose that pertained in any substantial manner to the protection of public health.

any does) is the three-year statute found in N.C. Gen. Stat. §1-52.[16]  It is

undisputed that the contract expired by its terms in 1997.  Therefore, if the

County had a cognizable cause of action, it accrued no later than the date

on which the contract expired, and the statute of limitations expired no later

than 2000.

## B.  Equitable Estoppel

The County argues that even if *nullum tempus* does not prevent the

running of the statute of limitations that the Defendant should be equitably

estopped from asserting the statute of limitations because "Time Warner's

representations and conduct deceived and lulled the County into believing

that the cable operator would provide the Mecklenburg County Institutional

Network, inducing the County to forego the pursuit of its legal remedies at

an earlier date." [Doc. 22 at 16].   The County accurately states the

elements that it must prove in order to prevail in applying the doctrine of

equitable estoppel as follows

---

[16]The Plaintiff pleads five causes of action: four in contract and one for conversion of the I-Net system.  The parties do not dispute that the three-year statute of limitations of N.C. Gen. Stat §1-52(1) applies to the contract claims and that the three-year statute of limitations of N.C. Gen. Stat. §1-52(4) applies to the conversion claim. The parties spend much time in their briefs arguing over whether an institutional network for cable broadcast that is to be delivered over the same physical infrastructure as the rest of the cable system constitutes a separate tangible asset capable of being converted.  The Court, however, need not reach that issue.  All the claims being asserted are barred by the applicable statutes of limitations, regardless of whether this very novel conversion claim is otherwise cognizable.

(1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The part asserting the [estoppel] must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

Friedland v. Gates, 131 N.C. App. 802, 807, 509 S.E.2d 793, 796-97 (1998) (quoting Parker v. Thompson-Arthur Paving Co., 100 N.C. App. 367, 370, 396 S.E.2d 626, 628-29 (1990)); see also White v. Consolidated Planning, Inc., 166 N.C. App. 283, 305, 603 S.E.2d 147, 162 (2004).

The Plaintiff's forecast of evidence fails as to the first element. The County argues that the "false representations" of the Defendant consisted of Time Warner providing some, but allegedly not all, of the INET infrastructure, while acknowledging that the nine channels (five upstream and four downstream) were reserved for the County and making "repeated promises" that it would meet its obligations. [Doc. 22 at 17]. This forecast of evidence consists only of partial performance and promises that the balance of performance was forthcoming. The County argues that mere promises of performance are sufficient to raise a jury question as to whether a defendant is estopped from asserting the statute of limitations, citing Nowell v. Great Atlantic & Pacific Tea Co., 250 N.C. 575, 108 S.E.2d

889 (1959). The County's reliance on <u>Nowell</u>, however, is misplaced. In that case the defendant had represented to the plaintiff that "*We have found the trouble and made the necessary corrections*. . . . My company will be entirely responsible and we will remedy the situation, *if it should occur*." <u>Id</u>. at 579, 108 S.E.2d at 891 (emphasis added). The representations of fact (the problem had been found and corrected) coupled with the conditional promise to cure if the corrections turn out to be ineffective, were held to be sufficient to invoke equitable estoppel. In the present case, however, the underlying representations of fact are completely absent from the County's forecast of evidence. A representation is a statement of a subsisting fact - i.e. that which is claimed to then exist or to have occurred in the past. A promise, on the other hand, is a commitment of what one intends to do in the future. The Plaintiff is unable to cite to a single case in which the reiteration of a promise to complete what the promissor was already obligated to do will support the application of equitable estoppel.[17]

---

[17] The County's assertion of equitable estoppel is quite ironic in light of the County's own conduct. When the County exercised its option to extend the contract for five additional years in 1992 it adopted an ordinance which expressly stated that "Vision Cable has substantially performed its franchise obligations." [Doc. 18-4 at 31]. After making this representation the County approved the assignment of the franchise from Vision Cable to Time Warner, obviously aware that Time Warner would be relying on the representation that Vision Cable had been in good standing. Nonetheless, thirteen years after having expressly represented that Vision Cable had satisfactorily performed,

As such the Plaintiff's forecast of evidence is insufficient to raise a

question of fact for the jury as to whether the Defendant is equitably

estopped from asserting the statute of limitations as a defense.  Therefore,

the statute of limitations ran no later than August 17, 2000, three years

after the expiration of the contract by its own terms.  Since more than three

years elapsed after the accrual of any cause of action asserted by the

Plaintiff, its claims are barred by the statute of limitations.  Summary

judgment for the Defendant is appropriate.

## C.  Obligations Under the Contract

Even though summary judgment is being granted based on the

_____

the County filed this action claiming that Vision Cable had failed to perform and had materially breached. As such, it appears that the County would be equitably estopped to deny that there was no breach.  This is true even though the County is a political subdivision of the State.  Equitable estoppel can be applied to a county "if it is necessary to prevent a loss to another and the estoppel will not impair the exercise of governmental powers." Kings Mountain Board of Education v. North Carolina State Board of Education, 159 N.C. App. 568, 577, 583 S.E.2d 629, 636 (2003), citing Land-of-Sky Regional Council v. County of Henderson, 78 N.C. App, 85, 91, 336 S.E.2d 653, 657 (1985), disc. review denied, 316 N.C. 553, 344 S.E.2d 7 (1986).  Both of these elements are shown by the uncontroverted evidence. See, also Part VI.A., *supra*.  The Court, however, need not reach the issue of whether Time Warner is entitled to summary judgment based on equitable estoppel, because judgment as a matter of law is appropriate due to the expiration of the statute of limitations.  In light of the fact that equitable estoppel is (obviously) an equitable doctrine, its application is barred, where otherwise applicable, by the doctrine of unclean hands. Creech v. Melnick, 347 N.C. 520, 529, 495 S.E.2d 907, 913 (1998) citing Gaston-Lincoln Transit, Inc. v. Maryland Cas. Co., 285 N.C.541, 546-47, 206 S.E.2d 155, 159 (1974); Tobacco Growers Co-op. Assn v. Bland, 187 N.C. 356, 360, 121 S.E. 636, 638 (1924); and In re Will of Covington, 252 N.C. 546, 549, 114 S.E.2d 257, 260 (1960).  In light of the County's conduct, it may not seek to invoke the Court's equity jurisdiction to prohibit the running of the statute of limitations.

expiration of the statute of limitations, it is noted that the Defendant would also be entitled to judgment as a matter of law based on the language of the contract documents.

"Where the language of a contract is 'clear and only one reasonable interpretation exists, the court must enforce the contract as written ... .'" Salvaggio v. New Breed Transfer Corp., 150 N.C.App. 688, 689, 564 S.E.2d 641, 643 (2002) (citations omitted). See also, Hultquist v. Morrow, 169 N.C.App. 579, 585, 610 S.E.2d 288, 293, *review denied* 359 N.C. 631, 616 S.E.2d 235 (2005) (where contract is unambiguous, the parties' intent is ascertained from the language of the contract). The contract at issue in this case actually consists of several documents. The Ordinance adopted by the County [Doc. 25 at 28-39] states that the terms of the franchise granted to Vision consisted of the provisions of the RFP [Doc. 23-2 at 2-34], as modified by the Ordinance, plus the provisions of Vision's Proposal [Doc. 30-4 at 2-12, 23-2 at 36-45], also as modified by the Ordinance. [Doc. 25 at 28-29]. These terms were modified by the amendment of May 17, 1982, [Doc. 25 at 41-44] before the terms were accepted by Vision. [Doc. 23-3]. The terms were again modified by the amendment of March 8, 1983, [Doc. 25 at 48], which was entered into after Vision accepted the franchise. Those documents, taken together, are clear as to Time

Warner's obligations regarding any Institutional Network.

The provisions regarding the I-Net evolved over these various documents. The RFP called for channels to be available to local health officials, educational programming and government officials. Vision's proposal called for links between institutional users such as colleges, senior citizen centers, day care centers, nursing homes and hospitals. The Ordinance, as originally accepted by Vision called for the franchisee to provide five Institutional Network ("downstream") channels, three of which were to be available to the County. [Doc. 25 at 33]. By the time of the acceptance of the contract by Vision, however, the list of the channels that Vision was to provide no longer made reference to any "upstream" channels. More importantly, the March 8, 1983, modification to the contract dropped the requirement for the Institutional Network, and replaced the reference thereto with the theretofore I-Net channels being "reserved for *future* use." [Doc. 25 at 48]. Since the I-Net was then deemed to be a *future* use, the plain meaning of the terms used in the contract is that Vision no longer had any *present* obligation to provide the I-Net channels for present use by the County.

This is confirmed by the County's ordinance of August 10, 1992, renewing Vision's contract based upon a finding that "Vision Cable has

substantially performed its franchise obligations." [Doc. 18-4 at 31]. By this finding the County confirmed that Vision had no present obligation to provide the I-Net channels. Vision had substantially performed even though it had not provided them.

Not only are the contract documents clear as to this point, but the forecast of evidence of the actions of the parties reflects that this was their understanding as well. Doris Boris, the County and City Cable Communications Administrator, testified on behalf of the County that in 1989 Vision wrote to the County asking for identification of the institutions to be included on the institutional network and a time frame for accomplishing connections to the system. [Doc. 30-6 at 134]. The County did not provide to Vision the information it requested. [Id.]. Moreover, Boris testified that during a ten-year performance review of Vision's system in 1992 [Doc. 30-6 at 144], the issue of partial compliance for the institutional network was noted within the evaluation but the blame for the failure of the network to be fully operational lay with the County, not Vision. [Id.]. In fact, "it was up to the County to pursue full utilization of the network." [Id., at 146]. Vision had completed the initial construction of the physical plant. [Id.]. The County's conclusion was that Vision had substantially performed and qualified for renewal of the franchise. [Id., at 145]. Vision had no

present obligation to do anything further under the contract. The County has presented no forecast of evidence that it ever completed what was necessary for it to have done in order for the franchisee's obligation to have matured into anything more than a requirement to reserve channel capacity for future use as part of the Institutional Network.

## VII. CONCLUSION

For the reasons stated herein, the Court concludes that the claims asserted by the Plaintiff are barred by the statute of limitations and therefore the Defendant is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that the Defendant's Motion for Partial Summary Judgment [Doc. 16] and the Defendant's Motion for Summary Judgment [Doc. 30] are **GRANTED** and this action is **DISMISSED** with prejudice. Judgment shall be entered contemporaneously herewith by separate document.

Signed: January 26, 2010

Martin Reidinger
United States District Judge